11-1126
United States v. Aleynikov

1                **UNITED STATES COURT OF APPEALS**
2
3                     **FOR THE SECOND CIRCUIT**
4
5                       August Term, 2011
6
7
8      (Argued: February 16, 2012      Decided: April 11, 2012)
9
10                      Docket No. 11-1126
11
12   - - - - - - - - - - - - - - - - - - -x
13
14   **UNITED STATES OF AMERICA**,
15
16                  **Appellee**,
17
18          - v.-
19
20   **SERGEY ALEYNIKOV**,
21
22                  **Defendant-Appellant**.
23
24   - - - - - - - - - - - - - - - - - - -x
25
26      Before:        JACOBS, Chief Judge, CALABRESI and
27                     POOLER, Circuit Judges.
28
29      Sergey Aleynikov appeals from his conviction, following

30   a jury trial, for stealing and transferring proprietary

31   computer source code of his employer's high frequency

32   trading system in violation of the National Stolen Property

33   Act, 18 U.S.C. § 2314, and the Economic Espionage Act of

34   1996, 18 U.S.C. § 1832.  On appeal, defendant argues, inter

35   alia, that his conduct did not constitute an offense under

1  either statute.  He argues that: [1] the source code was not

2  a "stolen" "good" within the meaning of the National Stolen

3  Property Act, and [2] the source code was not "related" to a

4  product "produced for or placed in interstate or foreign

5  commerce" within the meaning of the Economic Espionage Act.

6  The judgment of the district court is reversed.  Judge

7  Calabresi concurs in the opinion and has filed an additional

8  concurring opinion.

9                         KEVIN H. MARINO, Marino,
10                        Tortorella & Boyle, P.C.,
11                        Chatham, NJ, for
12                        Appellant.
13
14                        JOSEPH P. FACCIPONTI (JUSTIN S.
15                        WEDDLE, on the brief), Assistant
16                        United States Attorney, for
17                        PREET BHARARA, United States
18                        Attorney, Southern District of
19                        New York, New York, NY, for
20                        Appellee.
21
22  DENNIS JACOBS, Chief Judge:
23
24      Sergey Aleynikov was convicted, following a jury trial

25  in the United States District Court for the Southern

26  District of New York (Cote, J.), of stealing and

27  transferring some of the proprietary computer source code

28  used in his employer's high frequency trading system, in

29  violation of the National Stolen Property Act, 18 U.S.C.

30  § 2314 (the "NSPA"), and the Economic Espionage Act of 1996,

2

1    18 U.S.C. § 1832 (the "EEA").  On appeal, Aleynikov argues,

2    inter alia, that his conduct did not constitute an offense

3    under either statute.  He argues that: [1] the source code

4    was not a "stolen" "good" within the meaning of the NSPA,

5    and [2] the source code was not "related to or included in a

6    product that is produced for or placed in interstate or

7    foreign commerce" within the meaning of the EEA.  We agree,

8    and reverse the judgment of the district court.

9

10                              **BACKGROUND**

11        Sergey Aleynikov, a computer programmer, was employed

12   by Goldman Sachs & Co. ("Goldman") from May 2007 through

13   June 2009, developing computer source code for the company's

14   proprietary high-frequency trading ("HFT") system.  An HFT

15   system is a mechanism for making large volumes of trades in

16   securities and commodities based on trading decisions

17   effected in fractions of a second.  Trades are executed on

18   the basis of algorithms that incorporate rapid market

19   developments and data from past trades.  The computer

20   programs used to operate Goldman's HFT system are of three

21   kinds: [1] market connectivity programs that process real-

22   time market data and execute trades; [2] programs that use

                                    3

algorithms to determine which trades to make; and [3]
infrastructure programs that facilitate the flow of
information throughout the trading system and monitor the
system's performance.  Aleynikov's work focused on
developing code for this last category of infrastructure
programs in Goldman's HFT system.  High frequency trading is
a competitive business that depends in large part on the
speed with which information can be processed to seize
fleeting market opportunities.  Goldman closely guards the
secrecy of each component of the system, and does not
license the system to anyone.  Goldman's confidentiality
policies bound Aleynikov to keep in strict confidence all
the firm's proprietary information, including any
intellectual property created by Aleynikov.  He was barred
as well from taking it or using it when his employment
ended.

By 2009, Aleynikov was earning $400,000, the highest-
paid of the twenty-five programmers in his group.  In April
2009, he accepted an offer to become an Executive Vice
President at Teza Technologies LLC, a Chicago-based startup
that was looking to develop its own HFT system.  Aleynikov
was hired, at over $1 million a year, to develop the market

1    connectivity and infrastructure components of Teza's HFT

2    system.  Teza's founder (a former head of HFT at Chicago-

3    based hedge fund Citadel Investment Group) emailed Aleynikov

4    (and several other employees) in late May, conveying his

5    expectation that they would develop a functional trading

6    system within six months.  It usually takes years for a team

7    of programmers to develop an HFT system from scratch.

8        Aleynikov's last day at Goldman was June 5, 2009.  At

9    approximately 5:20 p.m., just before his going-away party,

10   Aleynikov encrypted and uploaded to a server in Germany more

11   than 500,000 lines of source code for Goldman's HFT system,

12   including code for a substantial part of the infrastructure,

13   and some of the algorithms and market data connectivity

14   programs.[1]  Some of the code pertained to programs that

15   could operate independently of the rest of the Goldman

16   system and could be integrated into a competitor's system.

17   After uploading the source code, Aleynikov deleted the

18   encryption program as well as the history of his computer

19   commands.  When he returned to his home in New Jersey,

---

[1] In addition to proprietary source code, Aleynikov also transferred some open source software licensed for use by the public that was mixed in with Goldman's proprietary code.  However, a substantially greater number of the uploaded files contained proprietary code than had open source software.

1    Aleynikov downloaded the source code from the server in
2    Germany to his home computer, and copied some of the files
3    to other computer devices he owned.

4        On July 2, 2009, Aleynikov flew from New Jersey to
5    Chicago to attend meetings at Teza.  He brought with him a
6    flash drive and a laptop containing portions of the Goldman
7    source code.  When Aleynikov flew back the following day, he
8    was arrested by the FBI at Newark Liberty International
9    Airport.

10       The indictment charged him with violating the EEA by
11   downloading a trade secret "that is related to or included
12   in a product that is produced for or placed in interstate or
13   foreign commerce," with the intent to convert such trade
14   secret and to injure its owner, to the economic benefit of
15   anyone other than the owner, see 18 U.S.C. § 1832(a) (Count
16   One); and with violating the NSPA, which makes it a crime to
17   "transport[], transmit[], or transfer[] in interstate or
18   foreign commerce any goods, wares, merchandise, securities
19   or money, of the value of $5,000 or more, knowing the same
20   to have been stolen, converted or taken by fraud," 18 U.S.C.
21   § 2314 (Count Two).  A third count charged him with
22   unauthorized computer access and exceeding authorized access

1  in violation of the Computer Fraud and Abuse Act, 18 U.S.C.

2  § 1030.

3      Aleynikov moved to dismiss the indictment for failure

4  to state an offense.  <u>See</u> Fed. R. Crim. P. 12(b)(3)(B).  The

5  district court dismissed Count Three of the indictment but

6  otherwise denied Aleynikov's motion.  <u>United States v.</u>

7  <u>Aleynikov</u>, 737 F. Supp. 2d 173 (S.D.N.Y. 2010).

8      As to Count One, the district court concluded: [1] the

9  stolen source code is a trade secret; [2] the HFT system

10 constitutes a "product" to which the source code relates

11 because the system was developed and modified through the

12 labor of Goldman's computer programmers; and [3] the HFT

13 system was "produced for" interstate commerce because it

14 facilitates the rapid execution of trades on financial

15 markets such as the New York Stock Exchange and NASDAQ.  <u>Id.</u>

16 at 177-79.  The district court reasoned that the whole

17 purpose of the HFT system was "to engage in interstate and

18 foreign commerce."  <u>Id.</u> at 179.

19     As to Count Two, the court held that the source code

20 for Goldman's HFT system constitutes "goods" that were

21 "stolen" within the meaning of the NSPA because, though

22 source code is intangible, it "contains highly confidential

7

trade secrets related to the Trading System" that "would be valuable for any firm seeking to launch, or enhance, a high-frequency trading business." Id. at 187.

Count Three was dismissed on the ground that Aleynikov was authorized to access the Goldman computer and did not exceed the scope of his authorization, and that authorized use of a computer in a manner that misappropriates information is not an offense under the Computer Fraud and Abuse Act. Id. at 192-94.

The jury convicted Aleynikov on Counts One and Two. He was sentenced to 97 months of imprisonment followed by a three-year term of supervised release, and was ordered to pay a $12,500 fine. Bail pending appeal was denied because Aleynikov, a dual citizen of the United States and Russia, was feared to be a flight risk.

Aleynikov appealed his conviction and sentence, arguing, among other things, that the district court erred in denying his motion to dismiss the indictment in its entirety. The Government did not appeal the dismissal of Count Three of the indictment.

On February 17, 2012, following oral argument, we issued a short order reversing Aleynikov's convictions on both counts, and indicated that an opinion would follow.

1

2                                  **DISCUSSION**

3        On appeal, Aleynikov renews his challenge to the

4   sufficiency of the indictment on both Counts One and Two.[2]

5   As to Count One, he argues that the source code is not

6   "related to or included in a product that is produced for or

7   placed in interstate or foreign commerce" within the meaning

8   of the EEA.  As to Count Two, Aleynikov argues that the

9   source code--as purely intangible property--is not a "good"

10  that was "stolen" within the meaning of the NSPA.

11       Aleynikov's challenge requires us to determine the

12  scope of two federal criminal statutes.  Since federal

13  crimes are "solely creatures of statute," <u>Dowling v. United</u>

14  <u>States</u>, 473 U.S. 207, 213 (1985) (internal quotation marks

15  omitted), a federal indictment can be challenged on the

16  ground that it fails to allege a crime within the terms of

17  the applicable statute.  See <u>United States v. Pirro</u>, 212

18  F.3d 86, 91-92 (2d Cir. 2000).[3]  The sufficiency of an

---

[2] Aleynikov challenges his conviction and sentence on several additional grounds as well.  Because we conclude that the indictment failed to state an offense, we need not resolve these additional challenges.

[3] On appeal, both the Government and Aleynikov frame their arguments in terms of the sufficiency of the indictment rather than the sufficiency of the evidence.

1  indictment and the interpretation of a federal statute are

2  both matters of law that we review <u>de novo</u>.  <u>See</u> <u>Fiero v.</u>

3  <u>Fin. Indus. Regulatory Auth., Inc.</u>, 660 F.3d 569, 573 (2d

4  Cir. 2011); <u>Pirro</u>, 212 F.3d at 92.

5      Statutory construction "must begin with the language

6  employed by Congress and the assumption that the ordinary

7  meaning of that language accurately expresses the

8  legislative purpose." <u>United States v. Albertini</u>, 472 U.S.

9  675, 680 (1985) (quoting <u>Park 'N Fly, Inc. v. Dollar Park &</u>

10 <u>Fly, Inc.</u>, 469 U.S. 189, 194 (1985)).  "Due respect for the

11 prerogatives of Congress in defining federal crimes prompts

12 restraint in this area, where we typically find a narrow

13 interpretation appropriate." <u>Dowling</u>, 473 U.S. at 213

14 (internal quotation marks omitted).

15     We conclude that Aleynikov's conduct did not constitute

16 an offense under either the NSPA or the EEA, and that the

17 indictment was therefore legally insufficient.  We consider

18 the statutes in the order they were briefed: the NSPA first,

19 the EEA second.

20

---

Because the result and analysis would be the same under
either formulation, for the purposes of this opinion we
adopt the one used by the parties, and do not decide which
is doctrinally more sound.

10

**I**

The NSPA makes it a crime to "transport[], transmit[], or transfer[] in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud."  18 U.S.C. § 2314.  The statute does not define the terms "goods," "wares," or "merchandise."  We have held that they provide "a general and comprehensive designation of such personal property or chattels as are ordinarily a subject of commerce."  In re Vericker, 446 F.2d 244, 248 (2d Cir. 1971) (Friendly, C.J.) (quoting United States v. Seagraves, 265 F.2d 876, 880 (3d Cir. 1959)).  The decisive question is whether the source code that Aleynikov uploaded to a server in Germany, then downloaded to his computer devices in New Jersey, and later transferred to Illinois, constituted stolen "goods," "wares," or "merchandise" within the meaning of the NSPA.  Based on the substantial weight of the case law, as well as the ordinary meaning of the words, we conclude that it did not.

11

1                            **A.**

2        We first considered the applicability of the NSPA to

3   the theft of intellectual property in <u>United States v.</u>

4   <u>Bottone</u>, 365 F.2d 389 (2d Cir. 1966) (Friendly, <u>J.</u>), in

5   which photocopied documents outlining manufacturing

6   procedures for certain pharmaceuticals were transported

7   across state lines.  Since the actual processes themselves

8   (as opposed to photocopies) were never transported across

9   state lines, the "serious question" (we explained) was

10  whether "the papers showing [the] processes that were

11  transported in interstate or foreign commerce were 'goods'

12  which had been 'stolen, converted or taken by fraud' in view

13  of the lack of proof that any of the physical materials so

14  transported came from [the manufacturer's] possession."  <u>Id.</u>

15  at 393.  We held that the NSPA was violated there, observing

16  that what was "stolen and transported" was, ultimately,

17  "tangible goods," notwithstanding the "clever intermediate

18  transcription [and] use of a photocopy machine."  <u>Id.</u>

19  However, we suggested that a different result would obtain

20  if there was no physical taking of tangible property

21  whatsoever:  "To be sure, where no tangible objects were

22  ever taken or transported, a court would be hard pressed to

12

conclude that 'goods' had been stolen and transported within

the meaning of 2314." Id. Hence, we observed, "the statute

would presumably not extend to the case where a carefully

guarded secret formula was memorized, carried away in the

recesses of a thievish mind and placed in writing only after

a boundary had been crossed." Id. Bottone itself thus

treats its holding as the furthest limit of a statute that

is not endlessly elastic:  Some tangible property must be

taken from the owner for there to be deemed a "good" that is

"stolen" for purposes of the NSPA.

Bottone's reading of the NSPA is confirmed by the

Supreme Court's opinion in Dowling v. United States, 473

U.S. 207 (1985), which held that the NSPA did not apply to

an interstate bootleg record operation.  Dowling rejected

the Government's argument that the unauthorized use of the

musical compositions rendered them "stolen, converted or

taken by fraud."  Cases prosecuted under the NSPA "have

always involved physical 'goods, wares, [or] merchandise'

that have themselves been 'stolen, converted or taken by

fraud'"--even if the stolen thing does not "remain in

entirely unaltered form," and "owes a major portion of its

value to an intangible component." Id. at 216.

1    "This basic element"--the taking of a physical thing--

2    "comports with the common-sense meaning of the statutory

3    language: by requiring that the 'goods, wares [or]

4    merchandise' be 'the same' as those 'stolen, converted or

5    taken by fraud,' the provision seems clearly to contemplate

6    a physical identity between the items unlawfully obtained

7    and those eventually transported, and hence some prior

8    physical taking of the subject goods." Id.[4]

9        We join other circuits in relying on Dowling for the

10   proposition that the theft and subsequent interstate

11   transmission of purely intangible property is beyond the

12   scope of the NSPA.

13       In a close analog to the present case, the Tenth

14   Circuit affirmed the dismissal of an indictment alleging

15   that the defendant transported in interstate commerce a

16   computer program containing source code that was taken from

17   his employer. United States v. Brown, 925 F.2d 1301, 1305,

---

[4] In holding the NSPA inapplicable to copyright
infringement, Dowling also relied on particular features of
the Copyright Act, including the carefully calibrated
criminal penalties for infringement:  Applying the NSPA to
copyright infringement would be a "blunderbuss solution to a
problem treated with precision when considered directly."
Id. at 226.  At the same time, the Court's reasoning and
analysis focuses on the pure intangibility of a copyright,
and the requirement under the NSPA that there be a physical
taking and removal of goods.

1309 (10th Cir. 1991).  Citing Dowling, the court held that

the NSPA "applies only to physical 'goods, wares or

merchandise'" and that "[p]urely intellectual property is

not within this category.  It can be represented physically,

such as through writing on a page, but the underlying,

intellectual property itself, remains intangible." Id. at

1307.  The Court concluded that "the computer program itself

is an intangible intellectual property, and as such, it

alone cannot constitute goods, wares, merchandise,

securities or moneys which have been stolen, converted or

taken" for purposes of the NSPA.  Id. at 1308.

Similarly, the Seventh Circuit has held that numerical

"Comdata codes" used by truckers to access money transfers

at truck stops constitute intangible property the theft of

which is not a violation of the NSPA.  United States v.

Stafford, 136 F.3d 1109 (7th Cir. 1998).  The court reasoned

that the codes themselves were not "goods, wares, or

merchandise," but rather "information"; that the defendant

had not been charged with transporting pieces of paper

containing the codes; and that the only conduct charged was

"transferring the codes themselves, which are simply

sequences of digits." Id. at 1114-15.

1    The First Circuit has also concluded that the NSPA does

2    not criminalize the theft of intangible things:  The NSPA

3    "does not apply to purely 'intangible information,' the

4    theft of which is punishable under copyright law and other

5    intellectual property statutes" but "*does apply* when there

6    has been 'some tangible item taken, however insignificant or

7    valueless it may be, absent the intangible component.'"

8    United States v. Martin, 228 F.3d 1, 14-15 (1st Cir. 2000)

9    (quoting Brown, 925 F.2d at 1307, 1308 n.14).

10    The Government argues that a tangibility requirement

11    ignores a 1988 amendment, which added the words "transmit[]"

12    and "transfer[]" to the terms: "transport[], transmit[], or

13    transfer[]."  The Government contends that the added words

14    reflect an intent to cover generally transfers and

15    transmissions of non-physical forms of stolen property.  The

16    evident purpose of the amendment, however, was to clarify

17    that the statute applied to non-physical electronic

18    transfers of *money*.  See United States v. Piervinanzi, 23

19    F.3d 670, 678 n.6 (2d Cir. 1994).  Money, though it can be

20    intangible, is specifically enumerated in § 2314 as a thing

21    apart and distinct from "goods," "wares," or "merchandise."

22    The addition to the possible means of transport does not

16

1   bespeak an intent to alter or expand the ordinary meaning of

2   "goods," "wares," or "merchandise" and therefore does not

3   obviate the Government's need to identify a predicate good,

4   ware, merchandise, security, or money that has been stolen.

5

6                                    **B.**

7        By uploading Goldman's proprietary source code to a

8   computer server in Germany, Aleynikov stole purely

9   intangible property embodied in a purely intangible format.

10  There was no allegation that he physically seized anything

11  tangible from Goldman, such as a compact disc or thumb drive

12  containing source code, so we need not decide whether that

13  would suffice as a physical theft.  Aleynikov later

14  transported portions of the source code to Chicago, on his

15  laptop and flash drive.  However, there is no violation of

16  the statute unless the good is transported with knowledge

17  that "the same" has been stolen; the statute therefore

18  presupposes that the thing stolen was a good or ware, etc.,

19  *at the time of the theft*.  The wording "contemplate[s] a

20  physical identity between the items unlawfully obtained and

21  those eventually transported."  <u>Dowling</u>, 473 U.S. at 216.

22  The later storage of intangible property on a tangible

17

1   medium does not transform the intangible property into a

2   stolen good.

3      The infringement of copyright in <u>Dowling</u> parallels

4   Aleynikov's theft of computer code.  Although "[t]he

5   infringer invades a statutorily defined province guaranteed

6   to the copyright holder alone[,] . . . he does not assume

7   physical control over the copyright; nor does he wholly

8   deprive its owner of its use."  <u>Id.</u> at 217.  Because

9   Aleynikov did not "assume physical control" over anything

10  when he took the source code, and because he did not thereby

11  "deprive [Goldman] of its use," Aleynikov did not violate

12  the NSPA.

13     As the district court observed, Goldman's source code

14  is highly valuable, and there is no doubt that in virtually

15  every case involving proprietary computer code worth

16  stealing, the value of the intangible code will vastly

17  exceed the value of any physical item on which it might be

18  stored.  <u>See</u> <u>Aleynikov</u>, 737 F. Supp. 2d at 187.  But federal

19  crimes are "solely creatures of statute."  <u>Dowling</u>, 473 U.S.

20  at 213 (internal quotation marks omitted).  We decline to

21  stretch or update statutory words of plain and ordinary

22  meaning in order to better accommodate the digital age.

1                            **II**

2        We next consider the sufficiency of the indictment as

3    to the EEA.  As with the NSPA count, we conclude that the

4    indictment was insufficient as a matter of law.

5

6                            **A.**

7        The EEA contains two operative provisions.  The first

8    section (18 U.S.C. § 1831(a)), which is not charged in the

9    indictment, applies to foreign espionage and is expressed

10   broadly:  "Whoever, intending or knowing that the offense

11   will benefit any foreign government, foreign

12   instrumentality, or foreign agent, knowingly . . . without

13   authorization . . . downloads, uploads, . . . transmits,

14   . . . or conveys a trade secret" is guilty of a federal

15   offense, and may be imprisoned for up to 15 years.  18

16   U.S.C. § 1831(a).

17       Aleynikov, however, was charged with violating 18

18   U.S.C. § *1832*, which imposes the italicized limitation

19   (which is not found in § 1831):  "Whoever, with intent to

20   convert a trade secret, *that is related to or included in a*

21   *product that is produced for or placed in interstate or*

22   *foreign commerce*, to the economic benefit of anyone other

19

1    than the owner thereof, and intending or knowing that the

2    offense will, injure any owner of that trade secret,

3    knowingly . . . without authorization . . . downloads,

4    uploads, . . . transmits, . . . or conveys such information"

5    is guilty of a federal offense, and may be imprisoned for up

6    to 10 years.  Id. § 1832(a) (emphasis added).

7        Thus there is a limitation--that products be "produced

8    for" or "placed in" interstate or foreign commerce--in the

9    statute Aleynikov is charged with violating, a limitation

10   that does not appear in the otherwise parallel foreign

11   espionage statute.  "Where Congress includes particular

12   language in one section of a statute but omits it in another

13   section of the same Act, it is generally presumed that

14   Congress acts intentionally and purposely in the disparate

15   inclusion or exclusion." Russello v. United States, 464

16   U.S. 16, 23 (1983) (internal quotation marks and alteration

17   omitted).  The requirement that products be "produced for"

18   or "placed in" interstate or foreign commerce therefore must

19   be read as a term of limitation.

20       The legislative history confirms this.  The version of

21   § 1832 that appeared in the original Senate bill did not

22   contain the limiting language.  It applied to any person who

steals "proprietary economic information having a value of
not less than $100,000"; it did not specify whether that
economic information relates to a product produced for or
placed in interstate commerce, and instead contained a
categorical finding that "the development and production of
proprietary economic information involves every aspect of
interstate commerce and business."  S. 1556, 104th Cong.
§§ 2(a), 3 (2d Sess. 1996), <u>reprinted in</u> S. Rep. No. 104-
359, at 1, 3.  The limiting language was introduced in the
House Bill.  <u>See</u> H.R. Rep. No. 104-788, at 2 (1996),
<u>reprinted in</u> 1996 U.S.C.C.A.N. 4021, 4021.  The words of
limitation in § 1832 were deliberately chosen.

    The natural reading that takes account of the distinct
meaning of the paired phrases ("produced for" and "placed
in") is that § 1832(a) identifies two separate but related
categories.  Products "placed in" commerce have already been
introduced into the stream of commerce and have reached the
marketplace.  Products that have not yet been "placed in"
commerce but are still being developed or readied for the
marketplace can properly be described as being "produced
for," if not yet actually "placed in," commerce.  Reading
the statute in this way gives effect to both categories of

1  product (those "produced for" commerce and those "placed in"
2  commerce), without making one a subset of the other.

3      This interpretation has the added virtue of construing
4  the two categories of product in relationship to one another
5  (a sequential or temporal relationship), and finds support
6  in the doctrine of statutory interpretation which instructs
7  that words in a statute are known by the company they keep.
8  See Gustafson v. Alloyd Co., Inc, 513 U.S. 561, 575 (1995)
9  (invoking this doctrine "to avoid ascribing to one word a
10  meaning so broad that it is inconsistent with its
11  accompanying words, thus giving unintended breadth to the
12  Acts of Congress" (internal quotation marks omitted)).  The
13  statute would fall short of critical protections if it
14  applied only to the theft of trade secrets relating to those
15  products that had already been "placed in" the marketplace;
16  left vulnerable would be the class of trade secrets inhering
17  in products that have not yet been placed on the market,
18  such as prototypes--precisely the kinds of trade secrets
19  that are likely to attract espionage.  Congress thus plugged
20  a gap by extending the statute's coverage to include
21  products "produced for" commerce as well as those already in
22  the marketplace.

1      The district court interpreted the phrase "produced

2  for" interstate or foreign commerce more broadly.  It held

3  that the HFT system was "produced for" interstate commerce

4  because "the sole purpose for which Goldman purchased,

5  developed, and modified the computer programs that comprise

6  the Trading System was to engage in interstate and foreign

7  commerce" and because "Goldman uses the Trading System to

8  rapidly execute high volumes of trades in various financial

9  markets" and "[t]he Trading System generates many millions

10  of dollars in annual profits."  <u>Aleynikov</u>, 737 F. Supp. 2d

11  at 179.  Under that interpretation, a product is "produced

12  for" interstate or foreign commerce if its purpose is to

13  facilitate or engage in such commerce.

14      The district court erred by construing the phrase--

15  "produced for . . . interstate or foreign commerce"--"in a

16  vacuum."  <u>See Davis v. Mich. Dep't of Treasury</u>, 489 U.S.

17  803, 809 (1989).  "It is a fundamental canon of statutory

18  construction that the words of a statute must be read in

19  their context and with a view to their place in the overall

20  statutory scheme."  <u>Id.</u>  That way, a statutory phrase

21  "gathers meaning from the words around it."  <u>Jones v. United</u>

22  <u>States</u>, 527 U.S. 373, 389 (1999) (internal quotation marks

23

omitted).  The district court's broad interpretation of the

phrase "produced for" commerce becomes untenable in light of

the paired phrase "placed in" commerce.  Since every product

actually sold or licensed is by definition produced for the

purpose of engaging in commerce, every product that is

"placed in" commerce would necessarily also be "produced

for" commerce--and the phrase "placed in" commerce would be

surplusage.  This interpretation is inconsistent with "one

of the most basic interpretive canons, that a statute should

be construed so that effect is given to all its provisions,

so that no part will be inoperative or superfluous, void or

insignificant."  Corley v. United States, 556 U.S. 303, 314

(2009) (internal quotation marks and alteration omitted);

see also Duncan v. Walker, 533 U.S. 167, 174 (2001) ("It is

our duty to give effect, if possible, to every clause and

word of a statute." (internal quotation marks omitted)).

"Judges should hesitate to treat statutory terms in any

setting as surplusage, and *resistance should be heightened*

*when the words describe an element of a criminal offense*."

Jones v. United States, 529 U.S. 848, 857 (2000) (internal

quotation marks and alterations omitted; emphasis added).

1      Even construed in isolation, the phrase "produced for

2  . . . interstate or foreign commerce" cannot command the

3  breadth that the district court and the Government ascribe

4  to it.  See generally Fed. Commc'ns Comm'n v. AT & T Inc.,

5  131 S. Ct. 1177, 1184 (2011) ("[C]onstruing statutory

6  language is not merely an exercise in ascertaining 'the

7  outer limits of [a word's] definitional possibilities'

8  . . . ." (quoting Dolan v. U.S. Postal Serv., 546 U.S. 481,

9  486 (2006)).  At oral argument, the Government was unable to

10 identify a single product that affects interstate commerce

11 but that would nonetheless be excluded by virtue of the

12 statute's limiting language.[5]  And even if one could

13 identify one such example, or two, it would not be a

14 category that would demand the attention of Congress, or be

15 expressed in categorical terms.

16     If § 1832(a) was intended to have such a sweep, we

17 would expect to see wording traditionally understood to

---

[5] The only example provided by the Government of a
trade secret that affects interstate commerce but that is
beyond the purview of the EEA was a proprietary training
manual for stock brokers.  But by the Government's
explanation, such a trade secret would not be covered
because the broker to whom it relates is a person and not a
"product," not because the training manual was not "produced
for . . . interstate or foreign commerce" as the Government
interprets that phrase.

1  invoke the full extent of Congress's regulatory power under

2  the Commerce Clause.  Notably, the EEA was enacted the year

3  after the Supreme Court issued its landmark decision in

4  United States v. Lopez, which held that Congress's Commerce

5  Clause authority is limited to those activities that

6  "substantially affect interstate commerce."  514 U.S. 549,

7  558-59 (1995).[6]  The Supreme Court observes a distinction

8  between "legislation invoking Congress' full power over

9  activity substantially 'affecting . . . commerce'" and

10 legislation which uses more limiting language, such as

11 activities "'in commerce,'" and thereby does not purport to

12 exercise the full scope of congressional authority.  Jones,

13 529 U.S. at 856 (quoting Russell v. United States, 471 U.S.

14 858, 859-60 & n.4 (1985)).  The temporal proximity between

15 the enactment of the EEA and the decision in Lopez makes

16 significant the omission from the EEA of the language

17 blessed in that case as invoking the outer limit of

18 Congress's regulatory authority.

---

[6] Lopez held that Congress may regulate three
categories of activity under its commerce power: [1] "the
use of the channels of interstate commerce"; [2] "the
instrumentalities of interstate commerce, or persons or
things in interstate commerce"; and [3] activities that
"substantially affect interstate commerce."  Id.  It is the
third of the three categories that is at issue in this case.

26

1                           **B.**

2          Goldman's HFT system was neither "produced for" nor

3    "placed in" interstate or foreign commerce.  Goldman had no

4    intention of selling its HFT system or licensing it to

5    anyone.  <u>Aleynikov</u>, 737 F. Supp. 2d at 175.  It went to

6    great lengths to maintain the secrecy of its system.  The

7    enormous profits the system yielded for Goldman depended on

8    no one else having it.  Because the HFT system was not

9    designed to enter or pass in commerce, or to make something

10   that does, Aleynikov's theft of source code relating to that

11   system was not an offense under the EEA.

12         Even if we were to conclude that the phrase "produced

13   for . . . interstate or foreign commerce" is susceptible to

14   a broader reading than we think it will bear, it would at

15   most render § 1832(a) facially ambiguous, which would not

16   assist the prosecution.  "[A]mbiguity concerning the ambit

17   of criminal statutes should be resolved in favor of lenity."

18   <u>Rewis v. United States</u>, 401 U.S. 808, 812 (1971).  And "when

19   choice has to be made between two readings of what conduct

20   Congress has made a crime, it is appropriate, before we

21   choose the harsher alternative, to require that Congress

22   should have spoken in language that is clear and definite."

1   <u>United States v. Universal C.I.T. Credit Corp.</u>, 344 U.S.

2   218, 221-22 (1952).

3          The conduct found by the jury is conduct that Aleynikov

4   should have known was in breach of his confidentiality

5   obligations to Goldman, and was dishonest in ways that would

6   subject him to sanctions; but he could not have known that

7   it would offend this criminal law or this particular

8   sovereign.

9

10                              **CONCLUSION**

11          For the foregoing reasons, the judgment of the district

12   court is reversed.

13

28